## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **STATE OF NEBRASKA; STATE OF ARKANSAS, ARKANSAS DIVISION OF YOUTH SERVICES; STATE OF KANSAS; ATTORNEY GENERAL BILL SCHUETTE, FOR THE PEOPLE OF THE STATE OF MICHIGAN; STATE OF MONTANA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF WYOMING,** | **Case No. _____** |
| **Plaintiffs,** | |
| **v.** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF EDUCATION; JOHN B. KING, JR., in his Official Capacity as United States Secretary of Education; UNITED STATES DEPARTMENT OF JUSTICE; LORETTA E. LYNCH, in her Official Capacity as Attorney General of the United States; VANITA GUPTA, in her Official Capacity as Principal Deputy Assistant Attorney General; UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; JENNY R. YANG, in her Official Capacity as Chair of the United States Equal Employment Opportunity Commission; UNITED STATES DEPARTMENT OF LABOR; THOMAS E. PEREZ, in his Official Capacity as United States Secretary of Labor; DAVID MICHAELS, in his Official Capacity as the Assistant Secretary of Labor for the Occupational Safety and Health Administration,** | |
| **Defendants.** | |

## INTRODUCTION

The State of Nebraska and nine additional States seek a declaration that the Department of Education ("ED") has violated the Administrative Procedure Act and numerous other federal laws by rewriting the unambiguous term "sex" under Title VII and Title IX to include "gender identity," thereby seeking to control even local school determinations regarding how best to designate locker room and bathroom assignments.  Without engaging in any rulemaking procedures—and in violation of the plain text and longstanding meaning of Titles VII and IX—ED issued a joint letter with the Department of Justice ("DOJ") on May 13, 2016, declaring "significant guidance." The letter confirmed that the federal executive branch has formalized its new definition of the term "sex" and threatened enforcement action against any of the more than 100,000 elementary and secondary schools that receive federal funding if those schools choose to provide students with  showers, locker rooms, and restrooms designated by biological sex, consistent with one's genes and anatomy.

Plaintiffs include States from all regions of the country that authorize, support, supervise,  or operate school systems and other institutions subject to ED's final agency action and enforcement threat. Plaintiffs stand united behind the constitutional principle that it is the duty of Congress to legislate, while it is the duty of the Executive Branch, including its various federal agencies, to administer and enforce the laws that Congress enacts. Defendants lack authority to amend those laws by executive fiat and to threaten Plaintiffs and their

subdivisions with the loss of billions of dollars in federal education funding if Plaintiffs continue to abide by the laws Congress actually passed.

## I. PARTIES

### A.   Plaintiffs

1.   Plaintiff State of Nebraska is subject to Title VII as the employer of thousands of people statewide.  The State of Nebraska also oversees and controls several agencies that receive federal funding subject to Title IX. For example, the Nebraska Correctional Youth Facility ("NCYF"), Geneva North School, and Kearney West School are operated by the State of Nebraska and receive federal funding subject to Title IX. For federal fiscal year 2015-2016, the Nebraska Department of Correctional Services has received to date $125,107 in federal education funds. For federal fiscal year 2015-2016, Geneva North received $59,584.70 in federal education funds and Kearney West received $143,407.45 in federal education funds. Additionally, for federal fiscal year 2015-2016, the Nebraska Department of Education received $328,604,163 in federal funding for K-12 education, of which $308,534,665 was distributed to local school districts in the State of Nebraska. For the federal fiscal year 2016-2017, the Nebraska Department of Education estimates that it will receive federal funding in the amount of $332,421,410, of which $312,215,578, will be distributed to local school districts.

2.   As Title IX has expressly permitted until now, Nebraska law allows for school districts to adopt policies which maintain separate locker room and restroom facilities for different sexes. Neb. Rev. Stat. § 79-2,124 (Reissue 2014) provides: "The

Nebraska Equal Opportunity in Education Act does not prohibit any educational institution from maintaining separate toilet facilities, locker rooms, or living facilities for the different sexes."

3. Plaintiff States of Arkansas, Kansas, Michigan, Montana, North Dakota, Ohio, South Carolina, South Dakota and Wyoming are similarly situated to the State of Nebraska in that one or more of the following circumstances is present: (1) they are employers covered by Title VII, (2) their agencies and departments are subject to Title IX, (3) their agencies and departments receive other federal grant funding that requires, as a condition of the grant, compliance with the Title IX provisions at issue in this lawsuit, and/or (4) they have public educational institutions, school districts, departments, or agencies in their State that are subject to Title IX.

4. For instance, Arkansas' Division of Youth Services also operates residential treatment centers for juveniles adjudicated delinquent, including the Mansfield Juvenile Treatment Center, the Mansfield Juvenile Treatment Center for Girls, and the Arkansas Juvenile Assessment and Treatment Center. Additionally, Arkansas operates several other specialized schools, including the Arkansas School for Mathematics, Science, and the Arts, the Arkansas School for the Blind and Visually Impaired, and the Arkansas School for the Deaf. Those institutions all receive federal funding subject to Title IX.

5. The State of Wyoming, through its Department of Family Services, directly operates residential treatment centers for juveniles adjudicated delinquent,

the Wyoming Boys' School and Wyoming Girls' School. Wyoming also plans for and constructs all K-12 public school facilities through a centralized state agency, the school facilities division of the state construction department.  These entities are subject to Title IX.

6.    The State of South Carolina received approximately $870 million in federal education funds in federal fiscal year 2015-2016.

7.    The State of Kansas received $534.7 million in federal education funds during federal fiscal year 2015-2016, of which $511 million was distributed to local school districts in the State of Kansas. For federal fiscal year 2016-2017, Kansas estimates that the amounts received from the federal government and distributed to local school districts will be approximately the same as in the 2015-2016 federal fiscal year.  Kansas also operates two specialized schools, the Kansas School for the Deaf and the Kansas State School for the Blind that receive federal funding subject to Title IX.  For federal fiscal year 2015-2016, the Kansas School for the Deaf received $325,826 in federal education funds, and the Kansas State School for the Blind received $517,901 in federal education funds.  Kansas estimates that both schools will receive approximately the same amount in federal education funds in the 2016-2017 federal fiscal year.  In addition, Kansas's Department of Corrections operates two juvenile correctional facilities, the Kansas Juvenile Correctional Complex and the Larned Juvenile Correctional Facility.  The Larned facility houses only males. Both facilities provide education services including high school diploma and general education development ("GED") programs.  Each of these facilities receives federal

funding subject to Title IX.  The Kansas Constitution delegates to the Kansas State Board of Education the "general supervision of public schools, educational institutions and all the educational interests of the state, except educational functions delegated by law to the state board of regents."  Kan. Const. art. 6, § 2(a). On June 14, 2016, the Kansas State Board of Education officially opposed the May 13, 2016 "guidance" issued by ED and DOJ, and unanimously adopted a response, which states in part:  "The recent directive from the civil rights offices of the United States Department of Education and the U.S. Department of Justice regarding the treatment of transgender students removes the local control needed to effectively address this sensitive issue.  We must continue to provide our schools the flexibility needed to work with their students, families and communities to effectively address the needs of the students they serve."  Kansas State Department of Education, Kansas State Board of Education statement in response to "Dear Colleague" letter on Title IX federal guidance. http://bit.ly/28LzQ1Q.

**B.    Defendants**

8.    Defendant ED is an executive agency of the United States and responsible for the administration and enforcement of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

9.    Defendant John B. King, Jr., is the United States Secretary of Education. In this capacity, he is responsible for the operation and management of ED. He is sued in his official capacity.

10.     Defendant DOJ is an executive agency of the United States and responsible for the enforcement of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, known as Title VII. DOJ also has the authority to bring actions enforcing Title IX. Exec. Order No. 12250, 28 C.F.R. Part 41 app. A (1980).

11.     Defendant Loretta A. Lynch is the Attorney General of the United States and head of DOJ. She is sued in her official capacity.

12.     Defendant Vanita Gupta is Principal Deputy Assistant Attorney General at DOJ and acting head of the Civil Rights Division of DOJ. She is assigned the responsibility to bring enforcement actions under Title VII and Title IX. 28 C.F.R. §42.412. She is sued in her official capacity.

13.     Defendant Equal Employment Opportunity Commission ("EEOC") is a federal agency that administers, interprets, and enforces certain laws, including Title VII. EEOC is, among other things, responsible for investigating employment and hiring discrimination complaints.

14.     Defendant Jenny R. Yang is the Chair of the EEOC. In this capacity, she is responsible for the administration and implementation of policy within EEOC, including the investigating of employment and hiring discrimination complaints. She is sued in her official capacity.

15.     Defendant United States Department of Labor ("DOL") is the federal agency responsible for supervising the formulation, issuance, and enforcement of rules, regulations, policies, and forms by the Occupational Safety and  Health Administration ("OSHA").

16.     Defendant Thomas E. Perez is the United States Secretary of Labor. In this capacity he is authorized to issue, amend, and rescind the rules, regulations, policies, and forms of OSHA. He is sued in his official capacity.

17.     Defendant David Michaels is the Assistant Secretary of Labor  for OSHA. In this capacity, he is responsible for assuring safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance. He is sued in his official capacity.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit concerns Defendants' unlawful revision of the term "sex" under multiple provisions of the United States Code and the new obligations Defendants are imposing on Plaintiffs under Title VII and Title IX. This Court also has jurisdiction to compel  an officer of the United States or any federal agency to perform his or her duty pursuant to 28 U.S.C. § 1361.

19.     Venue is proper in the Federal District Court of Nebraska pursuant to 28 U.S.C. § 1391 because the United States, several of its agencies, and several of its officers in their official capacity are Defendants, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

20.     This Court is authorized to award the requested declaratory relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Declaratory

Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202. The Court is authorized to order corrective action under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 611.

## III. STATEMENT OF FACTS

### A. Nebraska Law

21.    Nebraska law allows for school districts to adopt policies which maintain separate locker room and restroom facilities for different sexes. Specifically, Neb. Rev. Stat. § 79-2,124 (Reissue 2014) provides: "The Nebraska Equal Opportunity in Education Act does not prohibit any educational institution from maintaining separate toilet facilities, locker rooms, or living facilities for the different sexes." Title IX regulations issued by ED likewise expressly allow recipients of federal funding to "provide separate toilet, locker room, and shower facilities on the basis of sex," provided that the facilities provided for "students of one sex" are "comparable" to the facilities provided for "students of the other sex."

22.    Nebraska law provides school districts with the flexibility to fashion policies which weigh the dignity, privacy, and safety concerns of all students, while accommodating the legitimate interests of individuals who self-identify as having a gender that is the opposite of their sex.

### B. The Meaning of Title VII and Title IX

23.    In 1964, Congress enacted Title VII of the Civil Rights Act, making it illegal for employers to invidiously discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2.

24.     Eight years later, Congress passed Title IX of the Education Amendments of 1972. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681.

25.     The regulations implementing Title IX provide, in relevant part, that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular…or other education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a).

26.     The implementing regulations also provide that a funding recipient shall not, on the basis of sex: "Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; … Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; … Deny any person any such aid, benefit, or service; … Subject any person to separate or different rules of behavior, sanctions, or other treatment; …[or] Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity." 34 C.F.R. § 106.31(b).

27.     Nothing in Title IX's text, structure, legislative history, or accompanying regulations address gender identity.

28.     The term "gender identity" does not appear in the text of Title IX.

29.    The term "gender identity" does not appear in the regulations accompanying Title IX.

30.    The legislative history of Title IX reveals no intent to include "gender identity" within the meaning of "sex."

31.    In fact, the term "sex," as used in Title IX and its implementing regulations, means male and female, under the traditional binary conception of sex consistent with one's genes and anatomy. Title IX specifically allows institutions to differentiate intimate facilities by sex. 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."). Section 1686, which contains language substantially similar to Neb. Rev. Stat. § 79-2,124 (Reissue 2014), was added to address concerns that Title IX would force a college to allow women in dormitories designated for only men, and vice versa.

32.    Existing federal law does not forbid schools to provide students with showers, locker rooms, or restrooms  designated by biological sex, consistent with one's genes and anatomy.

33.    Because Title IX only covers "sex," not "gender identity," various attempts have been made amend the law. For example, since 2011, legislation has been introduced numerous times in the Senate that would protect against discrimination based on gender identity. This legislation has failed to pass every year it has been introduced.

34.     As this statutory and legislative history displays, Congress allowed for intimate living facilities separated by sex, and Title IX regulations, too, allow for separate showers, locker rooms, restrooms and changing areas for the different sexes. Like the Senate, the House has repeatedly declined invitations to expand Titles VII and IX to cover gender identity." For example, in 2007, the "Employment Non-Discrimination Act" was introduced in the House of Representatives, which would have expanded Title VII's scope to include gender identity. Just like the proposals the Senate has declined to adopt, this legislation has failed to pass every year it has been introduced.

**C.  The New Obligations Imposed by Defendants Under Title VII and Title IX.**

35.     The progression leading to the new obligations Defendants are imposing under Title VII and Title IX is recent in origin and  constitutes a complete reversal of the long-accepted understanding of the term "sex":

- In 2005, DOJ took the position that, as used in Title VII, "sex" unambiguously means male and female, and thus concluded that it prohibits discrimination against men *because they are men* and against *women because they are women*. It expressly determined that "sex" for purposes of Title VII does not include "transgender status" and nor, therefore, gender identity. *See* Defendant's Motion to Dismiss at 6, *Schroer v. Billington*, No. 05-1090 (August 1, 2005).

- In 2014, ED's Office of Civil Rights ("OCR") stated that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or  failure to conform to stereotypical notions of masculinity or femininity." OCR*, Questions and Answers on Title IX and Sexual Violence* B-2 (Apr. 29, 2014).

- Attorney General Eric Holder then issued a memorandum in 2014 concluding that Title VII's prohibition of sexual discrimination "encompasses discrimination based on gender identity, including

transgender status." DOJ, Memorandum from the Attorney General, *Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964* 2 (Dec. 15, 2014).

- Then, in 2015, OSHA announced that it had published "guidance" for employers regarding restroom access for individuals who identify with the sex opposite their own. Press Release, OSHA, *OSHA publishes guide to restroom access for transgender workers* (June 1, 2015), *available at* https://www.osha.gov/newsrelease/trade-20150601.html. OSHA's so-called guidance concluded that "all employees should be permitted to use the facilities that correspond with their gender identity," which is "internal" and could be "different from the sex they were assigned at birth." OSHA, *A guide to Restroom Access for Transgender Workers* (2015).

36.    The new obligations Defendants are imposing require that access be provided to all showers, locker rooms, and restrooms for individuals who self-identify as that sex. There are no limits whatsoever on how or why an individual so identifies.

37.    On May 9, 2016, DOJ acted under ED's redefinition of federal law by suing North Carolina and its University System, claiming that they were in violation of Title VII and Title IX based on the new obligations Defendants are imposing under Title VII and Title IX.

**D. The DOJ/ED Dear Colleague Letter**

38.    On May 13, 2016, DOJ and ED issued a joint "Dear Colleague Letter" ("Letter"), which set forth the new obligations Defendants seek to impose under Title IX as applicable to more than 100,000 elementary and secondary schools that receive federal funding. *Dear Colleague Letter on Transgender Students*, *available at* http://1.usa.gov/1TanAGJ.

39.    ED has communicated this Letter to school districts nationwide.

40.      The Letter directs that Title IX's use of the word "sex" now also means "gender identity." Further, the Letter threatens that schools that interpret Title IX as it has been understood by regulators and courts alike since 1972 will face legal action and the loss of federal funds. The Letter concerns "*Title IX obligations regarding transgender students*" and provides insight as to the manner in which ED and DOJ will evaluate how schools "are complying with their *legal obligations*" (emphasis added).  It refers to an accompanying document collecting examples from school policies and recommends that school officials comb through the document "for practical ways to meet *Title IX's requirements*" (same). Indeed, the Letter amounts to "*significant guidance*" (emphasis in original).

41.      According to the Letter, schools must now treat a student's "gender identity" as the student's "sex" for purposes of Title IX compliance.  "Gender identity," the Letter explains, refers to a person's "internal sense of gender," without regard to sex (i.e., anatomy or genetics). Gender identity can be the same as a person's sex, or different, and it can change over time.

42.      ED—the agency with primary enforcement authority over Title IX— has concluded that, although recipients may provide separate showers, locker rooms, and restrooms for males and females, when a school does so, it must treat individuals consistent with their gender identity, rather than their biological or genetic sex, with no regard for how or why the individual has so identified.

43.      Defendants are treating these new rules, regulations, and guidance as binding on all schools that are subject to Title IX.

44.     Defendants' new rules, regulations, and guidance constitute final agency action. *E.g., Bennett v. Speaker*, 520 U.S. 154, 177-78 (1997) (an agency action is final when it "mark[s] the 'consummation' of the agency's decision making process" and [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]"); *Ciba-Geigy Corp. v. United States EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986) ("[A]n agency may not avoid judicial review merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation.").

45.     Defendants' new rules, regulations, and guidance were not conditioned on the basis of site-specific facts.

46.     Defendants' new rules, regulations, and guidance impose new obligations that never previously existed.

47.     Defendants' new rules, regulations, and guidance were enacted without following the notice and comment procedures that the APA requires.

### E. Federal Education Funding

48.     The Letter bluntly states that allowing students to use private facilities consistent with their gender identity, irrespective of their sex, is "a condition of receiving federal funds." This loss of all federal funding for State and local education programs would have a major effect on State education budgets. All 50 States receive a share of the $69 *billion* in annual funding that the Federal Government directs to State and local education. ED, *Funds for State Formula-Allocated and Selected Student Aid Programs, U.S. Dep't of Educ. Funding,*

*available at* http://1.usa.gov/1BMc2yb (charts listing the amount of federal education funding by program nationally and by state).

49.     ED estimates that the federal government will spend over $36 billion in State and local elementary and secondary education, and over $30 billion in State and local postsecondary education programs in 2016.

50.     Not counting funds paid directly to state education agencies, or funds paid for non-elementary and secondary programs, the national amount of direct federal funding to public elementary and secondary schools alone  exceeds $55 billion on average annually—which amounts to 9.3% of the  average State's total revenue for public elementary and secondary schools, or $1,128 per pupil.

**F. Current and impending federal enforcement against Plaintiffs.**

51.     The State of Nebraska operates NCYF, Geneva North School, and Kearney West School.

52.     Kearney West High School operates as an all-male special purpose junior/senior high school at the Youth Rehabilitation and Treatment Center at Kearney.

53.     Geneva North High School operates as an all-female special purpose school at the Youth Rehabilitation and Treatment Center at Geneva.

54.     At Kearney West and Geneva North, accommodations are made for students who self-identify as the opposite sex. Such students are provided private shower, locker room, and restroom facilities.

55.     The United States Attorney General has indicated the Department of Justice will enforce the new obligations under Title VII and Title IX.

56.     Defendants have indicated they will enforce these new obligations under Title IX by direct and immediate action against entities, such as NCYF, Geneva North School, and Kearney West School that do not adhere to its new obligations.

57.     Indeed, ED has already enforced these new obligations under Title IX (in addition to the above-referenced pending action in North Carolina) on numerous occasions. ED's Office of Civil Rights, has included on its Web site a List of OCR Case Resolutions and Court Filings. *See* http://1.usa.gov/1YpXbFa.

58.     For instance, on June 21, 2016, ED determined that a public elementary school (Dorchester County School District Two) in South Carolina violated Title IX when it refused to allow a male student who identified as female to use the school's multiple-occupancy girls' restrooms, even though the elementary school made special accommodations for the student to use several single-occupancy restrooms throughout the building. ED concluded that the school discriminated against the student on the basis of sex in contravention of Title IX, including its implementing regulations that allow covered entities to provide separate restrooms on the basis of sex. Because ED determined that "sex" means "gender identity" for purposes of Title IX compliance, and therefore that the student was similarly situated to any other student who *identified* as female, it required the school to enter a Resolution Agreement promising to allow the biological male student to use

the girls' restrooms – and to participate in all of the schools programs and activities – in accord with that student's gender identity.

59.     ED and DOJ have informed Plaintiffs and their school districts that failure to conform to the executive branch's new mandate will bring adverse consequences, including a loss of federal education funding.

60.     Because of the final agency action and threat of enforcement from the federal government, various Plaintiffs are impelled immediately and significantly to modify behavior that was lawful before the new obligations, but are deemed unlawful by the federal government under the new obligations.

61.     Because of the final agency action and threat of enforcement from the federal government, various Plaintiffs are coerced to immediately budget and reallocate resources now to prepare for the loss of future federal funding.

## IV. CLAIMS FOR RELIEF

### COUNT ONE

**Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, and Guidance at Issue Are Being Imposed Without Observance of Procedure Required by Law**

62.     The allegations in paragraphs 1 through 61 are reincorporated herein.

63.     The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

64.     Defendants are "agencies" under the APA, *id.* § 551(1), and the new rules, regulations, and guidance described herein are "rules" under the APA, *id*. §§ 551(4), 701(b)(2), and constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

65.     Defendants have promulgated new rules, regulations, and guidance, unilaterally declaring that Title IX's term, "sex," means, or includes, "gender identity."

66.     Defendants have given these rules the full force of law.

67.     The new rules, regulations, and guidance impose new obligations on Plaintiffs.

68.     With exceptions that are not applicable here, the APA requires that any "rules which do not merely interpret existing law or announce tentative policy positions but which establish new policy positions that the agency treats as binding must comply with the APA's notice-and-comment requirements, regardless of how they initially are labeled." 72 Fed. Reg. 3433.

69.     The Supreme Court has held that all legislative rules—which are those having the force and effect of law and are accorded weight in agency adjudicatory processes—must go through the notice-and-comment requirements. *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1204 (2015).

70.     At minimum, notice-and-comment rulemaking requires that ED (1) issue a public notice of the proposed rule, most often by publishing notice in the

Federal Register, (2) give all interested parties a fair opportunity to submit comments on the proposed rule as well as evaluate and respond to significant comments received, and (3) include in the final rule's promulgation a concise statement of the rule's basis and purpose.

71.     Under Title IX, all final rules, regulations, and orders of general applicability that ED issues must be approved by the President of the United States. 20 U.S.C. § 1682.

72.     In creating new obligations under Title VII and Title IX, Defendants failed to properly engage in notice-and-comment rulemaking, and they promulgated their new rules without the President's signature.   Accordingly, the new rules, regulations, and guidance are invalid.

### COUNT TWO

**Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, and Guidance at Issue Are Unlawful by Exceeding Congressional Authorization**

73.     The allegations in paragraphs 1 through 72 are reincorporated herein.

74.     The new rules, regulations, and guidance described herein constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

75.     Defendants are "agencies" under the APA, *id.* § 701(b)(1), and the new rules, regulations, and guidance described herein are "rules" under the APA. *Id.* § 701(b)(2).

76.    The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C).

77.    Defendants' actions in promulgating and enforcing its new obligations are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because they redefine the unambiguous term "sex" in Title VII and Title IX, add gender identity to Titles VII and IX, and impose new obligations without Congressional authorization.  In other words, Defendants have effectively amended the relevant statutory language via unilateral administrative action.

78.    Congress has not delegated to ED the authority to define, or redefine, unambiguous terms in Title VII or Title IX.

79.    Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination…" 20 U.S.C. § 1681(a).

80.    The term "sex" as used in Title IX means male and female, under the traditional binary conception of sex consistent with one's anatomy and genes.

81.    The meaning of "sex", as used in Title IX, is not ambiguous.

82.    The meaning of "male" and "female," as used in Title IX, are not ambiguous.

83.    Title IX makes no reference to "gender identity" in the language of the statute.

84.     The enacting regulations, which interpret Title IX, likewise make no reference to "gender identity."

85.     Title IX's implementing regulations are not ambiguous in their instruction that a school district may separate showers, locker rooms, and restrooms on the basis of sex.

86.     The regulations implementing Title IX state that schools receiving federal funding "may provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilitates provided for students of the other sex." 34 C.F.R. § 106.33.

87.     Title IX does not require that covered entities cease providing showers, locker rooms, and restrooms designated by biological sex.

88.     Title VII's use of the word "sex" is just as unambiguous as Title IX's use of the word.

89.     Defendants' unilateral decree that "sex" in Title VII and Title IX means, or includes, "gender identity," is contrary to Title VII's and Title IX's text, implementing regulations, and legislative history.

90.     The Constitution provides Congress the power and responsibility to make law, while providing the Executive Branch, including federal agencies, the power and responsibility to administer and enforce the law. The new rules, regulations, and guidance described herein change the plain meaning of Title VII and Title IX, imposing new statutory obligations that Congress did not enact. Thus, the

new rules, regulations, and guidance functionally exercise lawmaking power reserved only to Congress. U.S. CONST. art. I, § 1 ("All legislative powers herein granted shall be vested in … Congress").

91.     Because the new rules, regulations, and guidance are not in accordance with the law articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

92.     Even if Defendants' new rules, regulations, and guidance were interpretive, they would still be in excess of statutory authority and should be declared unlawful and set aside.

## COUNT THREE

### Relief Under 5 U.S.C. § 706 (APA) that new Rules, Regulations, and Guidance at Issue Are Arbitrary and Capricious

93.     The allegations in paragraphs 1 through 92 are reincorporated herein.

94.     The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

95.     Congress requires that whenever an agency takes action, it do so after engaging in a process by which it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n. v. State Farm Ins.*, 463 U.S. 29, 43 (1983) (quotation omitted).

96.     An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise.

97.     Defendants gave no explanation for their redefinition of the term "sex" in Title VII or Title IX, whereby Defendants unilaterally decreed that the term "sex" in Title VII and Title IX means, or includes, gender identity.

98.     Nor did Defendants give any explanation of the relevant factors that were the basis of their actions.

99.     Defendants failed to consider important aspects of the dignity and privacy issues implicated for schools and other institutions caused by redefining the word "sex" in these statutory schemes, including the language and structure of Title VII and Title IX and their regulations, the congressional and judicial histories of Title VII and Title IX and their regulations, or the practical and constitutional harms created by Defendants' unlawful application of Title VII and Title IX.

100.    Defendants' actions were also taken without a rational explanation for usurping the local choices federal statutory law permits.

101.    Defendants' actions departed from explicit Title IX statutory text that allows schools to maintain private showers, locker rooms, and restrooms

separated by sex; and, it rested on considerations related to "gender identity," despite the fact that the plain statutory language and legislative history indicates Congress did not intend "sex" to mean anything other than biological sex, i.e., sex as indicated by an individual's anatomy and genes.

102.   Defendants' actions are arbitrary and capricious and not otherwise in accordance with the law.

103.   Defendants' new rules, regulations, and guidance would be unlawful if they were interpretive, instead of legislative, because they would still be arbitrary, capricious, an abuse of discretion, and not in accordance with law, and so should be declared unlawful and set aside.

## COUNT FOUR

**Relief Under 5 U.S.C. § 706 (APA) that the new Rules, Regulations, and Guidance at Issue Are Unlawful by Exceeding Congressional Authorization**

104.   The allegations in paragraphs 1 through 103 are reincorporated herein.

105.   The new rules, regulations, and guidance described herein constitute "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

106.   Defendants are "agencies" under the APA, *id.* § 701(b)(1), and the new rules, regulations, and guidance described  herein  are  "rules" under the APA. *Id.* § 701(b)(2).

107.   The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id*. § 706(2)(B)–(C).

108.    Defendants' actions in promulgating and enforcing its new rule are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because they redefine the unambiguous terms "discriminate" and "discrimination" and impose new obligations without the authorization of Congress.

109.    Congress has not delegated to Defendants the authority to define, or redefine, unambiguous terms in Title VII or Title IX.

110.    Title VII makes it unlawful for employers to "*discriminate* against any individual . . . because of such individual's . . . sex." 42 U.S.C. s. 2000e-2(a) (emphasis added). Title IX states that "[n]o person in the United States shall, on the basis of sex, be . . . subjected to *discrimination* . . . ." 20 U.S.C. s. 1681(a) (emphasis added).

111.    The term "discriminate," as used in Title VII, means to treat persons differently on the basis of a protected characteristic listed in the statute. The term "discrimination," as used in Title IX, means differential treatment of persons on the basis of a protected characteristic listed in the statute. In other words, under Title VII and Title IX, discrimination occurs when a protected characteristic, listed in the applicable statute, is made a basis for determining how persons are treated with regard to a matter encompassed by the statutes. Conversely, discrimination does not occur when a protected characteristic, listed in the applicable statute, is not taken into account for determining how persons are treated.

112.    The definitions of "discriminate" and discrimination," as used in Title VII and Title IX, are not ambiguous.

113.    The Constitution provides Congress the sole power and responsibility to make law, while providing the Executive Branch, including federal agencies, the power and responsibility to administer and enforce the law. The new rules, regulations, and guidance described herein change the meaning of Title VII and Title IX, imposing new statutory obligations that Congress did not enact while eliminating choices over the designation of intimate facilities that Congress affirmatively protected. Thus, the new rules, regulations, and guidance functionally exercise lawmaking power reserved only to Congress. U.S. CONST. art. I, § 1 ("All legislative powers herein granted shall be vested in … Congress").

114.    Because the new rules, regulations, and guidance are not in accordance with the law articulated above, they are unlawful, violate 5 U.S.C. § 706, and should be set aside.

115.    Even if Defendants' new rules, regulations, and guidance were interpretive, they would still be in excess of statutory authority and should be declared unlawful and set aside.

### COUNT FIVE

**Relief Under 28 U.S.C. §§ 2201 and 2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, and Guidance at Issue Are Unlawful and Violate Constitutional Standards of Clear Notice**

116.    The allegations in paragraphs 1 through 115 are reincorporated herein.

117.    The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

118.    When Congress exercises its Spending Clause power, principles of federalism require that Congress speak with a clear voice so that the recipient can "clearly understand," from the language of the law itself, the conditions to which they are agreeing to when accepting the federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Further, any interpretation of a federal law tied to State funding should be based on its meaning at the time the States opted into the spending program. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (providing that a state's obligation under cooperative federalism program "generally should be determined by reference to the law in effect when the grants were made").

119.    Neither the text nor the legislative history of Title IX supports an interpretation of the term "sex" as meaning anything other than one's sex as determined by anatomy and genetics, which was the meaning assigned "sex" by the leading dictionaries at the time Congress enacted the statute. This reality is reinforced by the fact that Congress has specifically used the phrase "gender identity" when it intended to use that concept to identify a protected class in *other* pieces of legislation. *See*, *e.g.*, 18 U.S.C. § 249(a)(2)(A); 42 U.S.C. § 13925(b)(13)(A). In such legislation, Congress specifically included the phrase "gender identity" along with the term "sex," thus evidencing its understanding that the phrase and term

mean different things and demonstrating its intent for the term "sex" to retain its original and only meaning— sex determined by anatomy and genetics.

120.    Defendants' new rules, regulations, and guidance change the meaning of Title IX, and so changes the terms for funding. This violates the constitutional requirements for legislation enacted pursuant to the Spending Clause power and so is unconstitutional.

121.    Defendants also run afoul of the Constitution by redefining "sex" in Title VII. Indeed, because Congress passed Title VII pursuant to its powers under Section 5 of the Fourteenth Amendment, the provisions thereof may not be altered to change the meaning of the Constitution itself. "Congress does not enforce a constitutional right by changing what the right is." *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997). Congress may only "enforce" – not redefine – constitutional protections when acting pursuant to Section 5 of the Fourteenth Amendment.  For this reason, there must be a "congruence and proportionality" between the statutory provisions at issue and an authorized purpose – i.e., ether the prevention of, or remedy for, a violation of the Constitution. *Id*. at 508. However, while the Equal Protection Clause of the Fourteenth Amendment has long been understood to prohibit discrimination on the basis of "sex," it has also always been construed to allow for disparate treatment of the sexes based on "inherent" "*physiological* differences between male and female individuals" and thus to allow institutions to provide male – or female-designated showers, locker rooms, and restrooms to

protect the "privacy" of "members of each sex[.]" *United States v. Virginia*, 518 U.S. 515, n. 19 (1996) (emphasis added).

122.    Thus, Defendants new rules, regulations, and guidance redefining "sex" in Title VII are not congruent and proportional to the Fourteenth Amendment.

## COUNT SIX

**Declaratory Judgment Under 28 U.S.C. §§ 2201 and 2202 (DJA) and 5 U.S.C. § 706 (APA) that the new Rules, Regulations, and Guidance at Issue Are Unlawful and Unconstitutionally Coercive**

123.    The allegations in paragraphs 1 through 122 are reincorporated herein.

124.    By placing in jeopardy a substantial percentage of Plaintiffs' budgets if they refuse to comply with the new rules, regulations, and guidance of Defendants, Defendants have left Plaintiffs no real choice but to acquiesce in such policy. *See NFIB v. Sebelius*, 132 S. Ct. 2566, 2605 (2012) ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce . . . .").

125.    "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB*, 132 S. Ct. at 2602 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "Congress may use its spending power to create incentives for [entities] to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.* (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). "That is

true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Id.*

126.    When conditions on the receipt of funds "take the form of threats to terminate other significant independent grants, the conditions are properly viewed as a means of pressuring the states to accept policy changes." *Id.*; *cf. South Dakota v. Dole*, 483 U.S. 203, 211 (1987).

127.    Furthermore, the Spending Clause requires that the entities "voluntarily and knowingly accept[]" the conditions for the receipt of federal funds. *NFIB*, 132 S. Ct. at 2602 (quoting *Halderman*, 451 U.S. at 17).

128.    Because Defendants' new rules, regulations, and guidance change the conditions for the receipt of federal funds *after* the states had already accepted Congress's original conditions for many decades, this Court should declare that the new rules, regulations, and guidance are unconstitutional because they violate the Spending Clause.

### COUNT SEVEN

### Declaratory Judgment Under 28 U.S.C. §§ 2201 and 2202 (DJA) and 5 U.S.C. § 611 (RFA) that the new Rules, Regulations, and Guidance Were Issued Without a Proper Regulatory Flexibility Analysis

129.    The allegations in paragraphs 1 through 128 are reincorporated herein.

130.    Before issuing any of the new rules, regulations, and guidance at issue, Defendants failed to prepare and make available for public comment an initial and final regulatory flexibility analysis as required by the RFA. 5 U.S.C.

§ 603(a). An agency can avoid performing a flexibility analysis only if the agency's top official certifies that the rule will not have a significant economic impact on a substantial number of small entities. *Id*. § 605(b). The certification must include a statement providing the factual basis for the agency's determination that the rule will not significantly impact small entities. *Id*.

131.    Defendants have not even attempted such a certification. Thus,  the Court should declare Defendants' new rules, regulations, and guidance unlawful and set them aside.

## II.  DEMAND FOR JUDGMENT

Plaintiffs respectfully request the following relief from the Court:

132.    A declaration that the new rules, regulations, and guidance are unlawful and must be set aside as actions taken "without observance of procedure required by law" under the APA;

133.    A declaration that the new rules, regulations, and guidance are substantively unlawful under the APA;

134.    A declaration that the new rules, regulations, and guidance are arbitrary and capricious under the APA;

135.    A declaration that the new rules, regulations, and guidance are invalid because Defendants failed to conduct the  proper regulatory flexibility analysis required by the RFA.

136.    A vacatur, as a consequence of each or any of the declarations aforesaid, as to the Defendants' promulgation, implementation, and determination

of applicability of the "significant guidance" document, and its terms and conditions, along with all related rules, regulations, and guidance, as issued and applied to Plaintiffs and similarly situated parties throughout the United States, within the jurisdiction of this Court.

137.    A final, permanent injunction preventing the Defendants from implementing, applying, or enforcing the new rules, regulations, and guidance; and

138.    All other relief to which Plaintiffs may show themselves to be entitled, including attorney fees and costs.

Respectfully submitted,

**STATE OF NEBRASKA; STATE OF ARKANSAS, ARKANSAS DIVISION OF YOUTH SERVICES, STATE OF KANSAS, ATTORNEY GENERAL BILL SCHUETTE, FOR THE PEOPLE OF THE STATE OF MICHIGAN, STATE OF MONTANA, STATE OF NORTH DAKOTA, STATE OF OHIO, STATE OF SOUTH CAROLINA, STATE OF SOUTH DAKOTA, STATE OF WYOMING, Plaintiffs.**

By:    DOUGLAS J. PETERSON
       *Attorney General of Nebraska*

By:    *s/ David Bydalek*
       David Bydalek, NE #19675
       *Chief Deputy Attorney General*

       OFFICE OF THE ATTORNEY GENERAL
       2115 State Capitol
       Lincoln, Nebraska 68509
       (402) 471-2682
       Dave.Bydalek@nebraska.gov

LESLIE RUTLEDGE
Attorney General of Arkansas

DEREK SCHMIDT
Attorney General of Kansas

BILL SCHUETTE
Attorney General of Michigan

TIM FOX
Attorney General of Montana

WAYNE STENEHJEM
Attorney General of North Dakota

MIKE DEWINE
Attorney General of Ohio

ALAN WILSON
Attorney General of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

PETER MICHAEL
Attorney General of Wyoming